**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Coast to Coast Claim Services, Inc., | ) | |
| a Nevada Corporation, | ) | |
| | ) | No. 21-cv-4641 |
| Plaintiff, | ) | |
| | ) | Hon., |
| v. | ) | Judge Presiding |
| | ) | |
| Raymond T. Yagelski, III, an individual, | ) | Hon. |
| Billy Musgrove, an individual, and | ) | Magistrate Judge |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF</u>

Plaintiff, Coast to Coast Claim Services, Inc. ("Coast to Coast"), by its attorneys, William G. Sullivan and Timothy Herman of Clark Hill, PLC, for its Complaint for Injunctive and Other Relief, states as follows:

## <u>NATURE OF THE CASE</u>

1.     Coast to Coast connects insurance adjusters with the inspectors, consultants, and technicians in the construction and restoration industries. It connects adjusters and estimators with inspectors who can provide accurate reports for small and large loss insurance claims, making their work more efficient.  This work was often done in the past by employees of insurance companies.  Outsourcing this work has had the effect of reducing overhead.  Outsourcing benefits insurance carriers by reducing work bottlenecks, reducing the cost of these services, and through increased efficiency.  For adjustors it reduces customer calls, improves customer service, and reduces contractor bids.  For affected property owners it tends to improve communication, eliminate concerns and provides accurate reporting of damages.  In an effort to create enhancements in the

reporting process, the president and sole shareholder of Coast to Coast, Majdy ("Michael") Bader, conceived of an app for mobile devices that would incorporate a suite of services that would greatly enhance the efficiency of the process, provide interface with reporting systems almost universally used by insurance companies, and provide a level of accuracy and detail not previously commercially available through an app. This action arises out of defendants' scheme to steal the fruits of Coast to Coast's investment of time, money, intellectual capital in the creation of that app, and to deprive it of the financial success that will come from the monetization of it.

## PARTIES

2.     Plaintiff Coast to Coast Claim Services, Inc., is a corporation duly organized and in existence under the laws of the State of Nevada, duly authorized to do business in the State of Illinois.  Its principal place of business is in Mokena, Will County, Illinois. Coast to Coast, Inc. is a citizen of the state of Nevada and Illinois.

3.     Defendant Raymond T. Yagelski, III, an individual, is a person who worked as a consultant and project manager for Coast to Coast.  Defendant Yagelski is a citizen of the State of Indiana.

4.     Defendant Billy Musgrove, an individual, is a former consultant to Coast to Coast. Billy Musgrove is a citizen of the state of Alabama.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(1) in that this is an action between citizens of different States where the matter in controversy exceeds the amount of $75,000, exclusive of interest and costs.

6.     Venue of this action is proper in this district pursuant to 28 U.S.C. §1391(a) in that a

substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

## NON-PARTY ACTORS

7.      Majdy "Michael" Bader is the president and sole shareholder of Coast to Coast.

8.      Robert Simon, at all times relevant to this complaint, has been employed by Coast to Coast as a software developer.

9.      Charles Donovan, at all times relevant to this complaint, has been employed by Coast to Coast as a software developer.

10.     Gerald "Jerry" Simonelli, at all times relevant to this complaint, has been employed by Coast to Coast as its Office Manager.

11.     "Ray" Yagelski, an individual, is a former consultant to Coast to Coast. Ray Yagelski is a citizen of the state of Indiana. Ray Yagelski is the son of Defendant Yagelski.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

12.     Coast to Coast Claim Services connects insurance adjusters with the inspectors, consultants, and technicians in the construction and restoration industries. It connects adjusters and estimators with skilled individuals who can provide fair and accurate reports for small and large loss insurance claims, making their work more efficient. Coast to Coast's backbone is its proprietary management system; it coordinates its employees and subcontractors. Its proprietary routing system helps to ensure that inspectors and adjustors have the information and software to operate quickly and efficiently. Coast to Coast's in-house development team equips the inspectors and adjustors with custom tools to get the job completed efficiently and accurately. Use of this proprietary software reduces the amount of time it takes for inspectors and adjustors to complete their tasks. As a result,

it provides more time for inspectors and adjustors to take on more work.

13.     Coast to Coast was founded by Michael Bader, its sole shareholder. Michael Bader is the President of Coast to Coast.  Mr. Bader has founded and operated related businesses, including a public adjustor company and a roofing and construction company.  He has a MBA with a concentration in project management.  He has a special interest in the creation and utilization of technology, including mobile apps, to create efficiencies, ensure consistency of product, and to expedite and streamline the flow of information to everyone associated with a project.

14.     In January 2021, Mr. Bader created a conception flow chart in which he envisioned a mobile device application ("app") that could be used by inspectors, adjustors, insureds, and insurance companies for the processing of insurance claims related to roofing damage claims. The app was conceived to give the insured, inspectors, and adjusters direct access to the scheduling of claims and status of those claims.  It would allow an insurance company to assign and schedule inspections directly through the app.  Its use would allow for the collection of information necessary to process those claims.  It would also generate internal reports for the insurance companies that utilized the app. This app would, in short, streamline the entire process.  It would do so in a way that created dependable, accurate reports. Its use would also serve to drive down the costs of claim processing for insurance companies.

15.     Although Michael Bader had in-house employees to rely on in the development of the app, he decided to place an advertisement on Indeed.com for a ladder assist director for a related company. Through discussions and negotiations, Michael Bader and Defendant Yagelski discussed the possibility of Defendant Yagelski working as a project director for software being developed by Coast to Coast. Defendant Yagelski answered the advertisement. He met with Michael Bader at

Coast to Coast's office in Mokena, Illinois.

16.     Prior to any exchange of confidential information, Yagelski executed a Confidentiality and Non-Disclosure Agreement with Coast to Coast on March 5, 2021. A true and correct copy of the Confidentiality and Non-Disclosure Agreement (the "Agreement") is attached as **Exhibit 1.** The Agreement defines "Confidential Information", among other things, as "source and object code and related technical information, including without limitation all algorithms, codes, and documentation relating thereto." Ex 1, ¶ 1.5.

17.     After the Agreement was executed, Mr. Bader described to Defendant Yagelski the app he conceived in January 2021, and the features Mr. Bader expected the app to incorporate. Since the app was expected to be used by people who were making claims, many of whom were expected to be unsophisticated in technology, it would need to incorporate easy-to-use features.

18.     Mr. Bader also described a camera feature that would provide the insurance company with photos imbedded with information that would contain detailed information to assist the insurance companies in determining the amount of money to be awarded for each claim.

19.     During his interview, Defendant Yagelski agreed to serve as a full-time consultant to Coast to Coast. He eschewed a technical employer-employee relationship.

20.     Defendant Yagelski was retained as an independent contractor; he was given the title of Project Manager. He was an independent contractor in name only. He was paid at the rate of $1,500 per week. He had complete access to all of Coast to Coast's most sensitive technical data and information. He supervised the work of all software developers who worked on the app project on behalf of Coast to Coast. He controlled access to all the work done by the developers who were specifically retained to work on the project in China. He reported to, and was supervised by, Michael

5

Bader. He maintained exclusive access to work by Chinese software developers, while at the same time acknowledging the information belonged to Coast to Coast.

21.    His first check was issued on March 26, 2021.  He continued to work for Coast to Coast as Project Manager for the development of the app conceived by Michael Bader until August 25, 2021.  During the original meeting with Michael Bader, and throughout his tenure at Coast to Coast, it was always agreed and understood by Defendant Yagelski and Coast to Coast that, any software that was written or developed as part of this project, would be Coast to Coast property. Yagelski acted as an agent of Coast to Coast in the development efforts to create the software envisioned by Michael Bader.

22.    Defendant Yagelski had attempted in the past to create a couple of apps that had some, but very limited, functionality envisioned by Michael Bader: a report app and a camera app. Defendant Yagelski's software was rudimentary.  It crashed.  It had limited functionality, and extreme instability.  It had never been sold. It was unmarketable.  Functional equivalents were available at little, if any, cost. He made the decision to incorporate certain aspects of that software into that which was being created by and for Coast to Coast. Defendant Yagelski exhibited very limited knowledge of software programming. In fact, he requested Coast to Coast's in-house software developers to teach him IT skills.

23.    During the time Defendant Yagelski served as Project Manager, he had unfettered access to every aspect and element of design created by Coast to Coast's in-house software developers, Charles Donovan and Robert Simon. In fact, they reported directly to Defendant Yagelski for the entire time he worked at Coast to Coast. In addition, two developers in China, whose names are Yin and Tao, also worked on the Coast to Coast apps. Messrs. Yin and Tao, in turn,

supervised teams of individuals who were writing the software, including creation of the source codes. Their fees were paid by Coast to Coast. Coast to Coast reposed trust and confidence in Defendant Yagelski, on whom it relied to act in its best interests, with a resulting dependence and reliance on him. It was a dependence and reliance he cultivated and induced.

24.     Defendant Yagelski worked under the direction and control of Michael Bader. He had no employees.  He was provided an office by Coast to Coast. He was provided a Coast to Coast-owned computer and computer monitor. It has recently been discovered that he did little, if any, work on the Coast to Coast computer. He also used a Coast to Coast-owned mobile phone.  He took home a Coast to Coast-owned van.  He had twenty-four hour per day access to the Coast to Coast offices. He was given the code to disarm the burglar alarm system. He often slept at the Coast to Coast office. He looked through the computer files of others who worked at the office, including those of the Office Manager, Jerry Simonelli, whose computer Defendant Yagelski would access without permission, outside of ordinary business hours. Yagelski boasted he had a "trick" that he used to gain unauthorized access to computers.

25.     For much of the time that Defendant Yagelski worked at Coast to Coast, he promised to accomplish various development milestones, always claiming that they were "two weeks away" from being done. There were multiple functions that were being worked on at one time, including the following:

- **Report App**

    Through the report app, the inspector or adjuster has the ability to submit a detailed report of the inspection without the need for pen or paper utilizing only their phone or tablet. The Report App also takes the information imputted and generates a report document for distribution.

- **Camera App**

The Camera App makes use of user inputs through a graphical user interface (GUI). A GUI is a type of user interface through which users interact with electronic devices via visual indicator representations. The Camera App takes user inputs through a GUI to customize the name of a picture being taken with descriptive information. The name and descriptive information is formatted in a way that allows the property to be easily identified and imported into a software reporting system known as Xactimate. Xactimate is an industry standard software used by the vast majority of the insurance industry. The camera app and report app create substantial time efficiencies for inspectors or adjusters.

- **CRM**

  CRM is an acronym of the term "customer relationship management." Broadly, CRM is any practice, technology, or strategy designed to help businesses improve their customer relationships. In the context of what was being created by Coast to Coast, it was the Online Dashboard to be accessed by users of the app.

  The Online Dashboard was developed to maintain a high level of communication with insureds, inspectors, and adjusters allowing them to view the claims they submitted, along with the status of their claims, and any other information maintained about them.

  The Online Dashboard was also created to be used by the company, allowing inspectors to easily view their assigned claims, allowing team leaders to monitor claim progress and allowing schedulers to easily assign and schedule a date and time for each inspection.

- **Inspector App**

  The Inspector App is an all-in-one tool for inspectors and adjusters. This app allows the user to view their assigned claims, assist in navigating to the claim location at the proper time, insert new claims into the system, access the On Demand system remotely, and access the Company's Camera and Report technology.

- **Adjuster App**

  An easy to use application that allows Adjusters or other individuals to submit claim service requests into the company's system from anywhere with their phone, which are viewed and taken by individuals at their discretion.

26.     Defendant Yagelski chose the software developers in China who supported the efforts

of Coast to Coast, including its employees in the United States. Those developers in China worked

with Yagelski on at least one prior project. All costs and fees associated with their work were paid by Coast to Coast.

27. Defendant Yagelski arranged to have the Coast to Coast developers in Illinois communicate with the developers in China through a program called Google Hangout. Defendant Yagelski told Charles Donovan that Yagelski had instructed the Chinese developers not to speak directly to the developers in the United States. That conversation occurred on or about May 19, 2021.

28. On multiple occasions Messrs. Donovan and Simon requested direct access to the source code of the software being developed for Coast to Coast in China. The source code is the text listing of commands to be compiled or assembled into an executable computer program. Defendant Yagelski responded to each request by stating that he would arrange for them to gain access. On one occasion, he instructed one of the developers, Charles Donovan, to open a GitHub account to fulfill the request for access to the source code. GitHub is a computer website where tens of millions of software developers share their programs and collaborate on them.

29. After Mr. Donovan opened a GitHub account, Defendant Yagelski came up with other lame excuses for not allowing access. Defendant Yagelski always acknowledged the right of access to the source codes by Coast to Coast employees, but repeatedly devised pretextual bases for not accomplishing the requested access. When he ran out of excuses, he simply said he would get it done in the coming days. Ultimately, he used the excuse that the software developers in China might think that the project was being taken away from them, if permission to access the source codes was granted. On that basis, he continued to disallow access.

30. Billy Musgrove was hired as a consultant by Coast to Coast at the request of Defendant Yagelski. Billy Musgrove is a close personal friend of Defendant Yagelski. Defendant

Yagelski did not disclose his personal relationship with Billy Musgrove to Michael Bader, whose permission was necessary to hire him. Billy Musgrove began work in approximately the end of June, or the beginning of July, 2021. He was brought on by Coast to Coast to market and sell Coast to Coast services.

31. Billy Musgrove assigned Messrs. Simon and Donovan to improve the ClaimMate website, which is owned personally by Defendant Yagelski. ClaimMate is a trade name used by Defendant Yagelski for his personal business, unrelated to Coast to Coast. See https://www.claimmate.com (last visited August 29, 2021). No authority for this personal work was granted by Coast to Coast. Defendant Yagelski instructed Robert Simon and Charles Donovan to perform any tasks assigned by Mr. Musgrove.

32. Billy Musgrove also directed Robert Simon to work on Musgrove's personal LinkedIn profile, and to alter it to show that Mr. Musgrove was working at ClaimMate during the very time he was working at Coast to Coast. As Messrs. Simon and Donovan had no idea of what relationship, if any, ClaimMate had to Coast to Coast's project, they followed the instructions of Mr. Musgrove.

33. Billy Musgrove directed Robert Simon to update Musgrove's personal resume.

34. Billy Musgrove directed Robert Simon to work on the ClaimMate LinkedIn company page, although he did not gain access to the page.

35. Billy Musgrove requested Mr. Simon to create a ClaimMate email campaign. ClaimMate, an unregistered and unincorporated trade name, is used by Defendant Yagelski. Mr. Simon put together a "cold open" email to market that product. The email was reviewed by Defendant Yagelski and Mr. Musgrove, both of whom approved its content. A true and correct copy of the email is attached as **Exhibit 2.**

36.     Billy Musgrove requested Mr. Simon to work on a 2-D whiteboard video for ClaimMate.  The video would represent the "ClaimMate" camera, and the benefits it provided to adjustors.  In truth and in fact, ClaimMate had no functional camera app, and the video described that which had been created by and for Coast to Coast, though falsely attributing the technology to ClaimMate. A true and correct copy of the text to be spoken in the video is attached as **Exhibit 3.**

37.     Billy Musgrove was fired as a consultant on Tuesday, August 17, 2021, after some of his wrongful conduct became known to Mr. Bader.

38.     Ray Yagelski, son of Defendant Yagelski, was employed as a consultant to Coast to Coast at the insistence of his father starting on or about July 19, 2021. He worked at the offices of Coast to Coast for approximately two weeks. He had complete knowledge and oversight of the software being developed by Coast to Coast.

39.     Ray Yagelski worked at Coast to Coast offices in Mokena, Illinois.  Coast to Coast was registered to participate at the Global Insurance Accelerator ("GIA") Symposium in Des Moines scheduled for August 31, 2021 and September 1, 2021 (the "Symposium"). Startup technology companies apply to attend this Symposium to present their technology to investors. Only twelve are chosen to do so.  Other software companies have the opportunity to attend, network and market their technologies.

40.     Starting on the first day Ray Yagelski worked at Coast to Coast, he evidenced an intimate knowledge of Coast to Coast's proprietary software, including knowledge of at least one software application that was not among those being developed in conjunction with the project committed to his father. The detail knowledge he exhibited could have come from only one person: his father, Defendant Yagelski.

41.     On or about August 13, 2021, Defendant Yagelski initiated an in-person conversation with Charles Donovan at the offices of Coast to Coast.  Yagelski discussed the prospects of the company.  In that conversation, Defendant Yagelski said to Charles Donovan, "I don't think this company will ever do a single claim."

42.     Following up on that comment, Defendant Yagelski asked Mr. Donovan where Mr. Donovan believed the value of the company resided. Mr. Donovan said that he believed there was value in the inspector services, and its system for connecting insurance companies with people to work for them.  Defendant Yagelski dismissed that opinion out of hand, saying, "The only thing we [Coast to Coast] have worth selling is the technology."

43.     At the direction of Defendant Yagelski, Ray Yagelski, Robert Simon and Charles Donovan and Defendant Yagelski worked together to prepare a "sales pitch," otherwise known as an "elevator pitch" for the Symposium.

44.     All four persons collaborated at Coast to Coast offices in Mokena, Illinois to contribute to the creation of the sales pitch over several days. Coast to Coast was registered to participate at the Symposium.

45.     At the direction of Defendant Yagelski and Ray Yagelski, the elevator pitch was prepared for, and on behalf of, ClaimMate, the trade name used by Defendant Yagelski, not Coast to Coast.  The software is referred to as "ClaimMate" software.  See a true and correct copy of the Elevator Pitch prepared on August 6, 2021, a true and correct copy of which is attached as **Exhibit 4**. Nowhere in the Elevator Pitch is the name Coast to Coast referred to. Every reference to the name of the software, or ownership of the software, refers exclusively to ClaimMate, including the following:

> ClaimMate is an all in one software that solves these failures by using proprietary technology. 100s of adjusters have used it for years,

12

completing thousands of claims.

\*\*\*\*\*\*

ClaimMate is a unique all in one software that is able to correct these flaws by using proprietary technology. 100s of adjusters have used it for years, completing thousands of claims at a rate unmatched.

\*\*\*\*\*

Goal - Spread awareness of ClaimMate's app.

Exhibit 4.

46.     It is clear that Defendant Yagelski was preparing to exit from his duties at Coast to Coast in the first week of August 2021. It is also clear that he intended to sell Coast to Coast software as his own.

47.     On August 25, 2021, less than two weeks later after telling Mr. Donovan that the "only thing Coast to Coast had worth selling is the Technology," Defendant Yagelski walked away with the keys to that technology with the intent to market as his own.

48.     It is clear that Defendant Yagelski had it in mind to promote the software developed by Coast to Coast, which was the reason he denied access to the source codes from the beginning of the time he worked on the Coast to Coast project until the day he resigned. The timing of his resignation was not an accident. He intended to cut all ties with Coast to Coast prior to the GIA Symposium in order to market the software owned by Coast to Coast under the ClaimMate trade name to reap the profits of Coast to Coast's invention, beginning with the GIA Symposium in Des Moines, Iowa.

49.     After Defendant Yagelski resigned, the true extent of his wrongful conduct became manifest. It was only then that Defendant Yagelski's intentions and wrongful conduct became

known to Michael Bader, president of Coast to Coast. Others at the company, including Jerry Simonelli, Robert Simon and Charles Donovan had not reported Defendant Yagelski earlier, because they were told to follow his instructions and direction. Moreover, they did not have the requisite knowledge to understand that Defendant Yagelski had betrayed the confidence and trust that the company had reposed in him.

50.    The day after Defendant Yagelski severed ties with Coast to Coast, on August 26, 2021, a cease and desist letter was sent with a demand that he immediately return all company property in his possession. A true and correct copy of the cease and desist letter, sent by William G. Sullivan, one the attorneys for Coast to Coast, is attached as **Exhibit 5**. The letter states, in relevant part, as follows:

> It is now clear you intend to market software owned by the Company under the name ClaimMate as if it were owned by you. Unless I receive a written undertaking from you not to do so, the Company will file an action against you seeking injunctive relief and damages.
>
> *****
>
> This letter is also a demand that you cease and desist all activities and attempts to market, convey or transfer any interest in the Company Technology and a further demand that you cease and desist any and all attempts by you, alone or with others, to injure or undermine Mr. Bader's rights and interests in the Company Technology.

Exhibit 5, p. 3. The letter also requested a return of Coast to Coast property. *Id.*

51.    True to form, Defendant Yagelski employed a deflection tactic for which he was known during his time at Coast to Coast. He did return most of the property in his possession owned by Coast to Coast on August 27, 2021, but not a Dell Computer purchased by the company at his request on August 17, 2021, which cost $1,931.17. He effected the return of personal property by bypassing the burglar alarm and placing the property in Coast to Coast's offices when no one else was present. This bypass was reported by Michael Bader, the Owner of Coast to Coast.

52.    On August 27, 2021, Defendant Yagelski sent a self-serving text to Michael Bader, which reads as follows:

> Majdy [Michael],
> I put the van in the parking lot
>
> The key is on the deal in the office I used with the chrome book and the iphone
>
> Both of them should be in the exact same condition as when I got them. I never opened them up or used them for anything.
>
> I don't have any credit cards of yours.
>
> My son scratched the back of the van last week.
>
> I don't think anyone would ever notice, but I turned in a claim to my insurance instead of c2cs so that you can get it fixed the right way & not have it affect c2c rates.
>
> I apologize for any inconvenience
>
> The adjuster will get a hold of you to take care of it.
>
> Here is his contact info
>
> Progressive Paloverde Insurance Co
>
> Claim: **********3584
>
> Rep: PATRICK KLATT
>
> Rep Phone Number: 417-***-3693
>
> Take care,
>
> Ray

53.    There has been no communication from Defendant Yagelski in which he has acknowledged Coast to Coast's ownership of the software that it created, or the substantive demands of Coast to Coast to return its intellectual property, or to refrain from marketing the technology owned by it.

15

54.     On August 27, 2021, William G. Sullivan sent a letter to Managing Director Nicole Gunderson and Program Director Megan Brandt of GIA. A true and correct copy of the letter is attached as **Exhibit 6.** As a part of the August 27, 2021 letter sent to the GIA representatives, Mr. Sullivan attached the August 26, 2021 Letter sent to Defendant Yagelski which contain the underlying facts that form the basis of the instant lawsuit. The letter also requested that the GIA representatives inform counsel if Defendant Yagelski would be allowed to participate in the GIA Symposium, whether his name, that of ClaimMate, or under the name of any other name or entity. Exhibit 6.

55.     On August 30, 2021, Managing Director Nicole Gunderson responded to the August 27, 2021 Letter and indicated that GIA would allow Defendant Yagelski to participate in the GIA Symposium scheduled for August 31, 2021 and September 1, 2021. A true and correct copy of the August 30, 2021 Letter is attached as **Exhibit 7.**

56.     It is now clear that Defendant Yagelski intends to move forward with his plan to deprive Coast to Coast of its valuable property, including attending the upcoming GIA Symposium and using Coast to Coast's technology and Confidential Information when meeting with insurance representatives and potential investors. It is also clear that Defendant Yagelski intends to market and monetize it, and to reap the rewards of Coast to Coast's investments of time, money and intellectual capital.

57.     Coast to Coast has suffered, and continues to suffer, damages as a result of Defendants' wrongful conduct.

58.     Coast to Coast has no adequate remedy at law. Money damages cannot compensate for the loss of the unique property that Defendant Yagelski has stolen. It would take many months,

16

perhaps a year, to rewrite the programs for which Coast to Coast has already paid. In that time, Richard T. Yagelski will have an unfair market advantage in marketing the software to insurance companies. Money damages cannot compensate for the loss of competitive advantage that belong to Coast to Coast in being the first to offer the unique software conceived by Michael Bader. Nor can money damages compensate for the theft of Michael Bader's unique vision.

59.     Defendant Defendant Yagelski has demonstrated that he will continue to engage in acts that harm Coast to Coast. It is clear that the injury to Coast to Coast is immediate, irreparable and continuing.

60.     Coast to Coast has pled sufficient facts to demonstrate a likelihood of success on the merits.

61.     Should the court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Yagelski or Billy Musgrove will be slight compared to the injury to Coast to Coast, if the relief sought is not granted. No injury will result from an order that requires Defendants to comport their actions with the law. Hence, a nominal bond, if any, is all that should be required.

62.     The granting of a temporary restraining order and preliminary injunction will not harm the public interest, but will in fact benefit the public interest by ensuring that the law is followed.

**COUNT I**
**BREACH OF FIDUCIARY DUTY**
**(DEFENDANT YAGELSKI)**

63.     Coast to Coast realleges paragraphs 1 through 62 as though fully set forth herein.

64.     At all relevant times to this Complaint, Defendant Yagelski was a fiduciary of Coast to Coast. Coast to Coast reposed great trust and confidence in him. It allowed him access to its most

important assets, including Coast to Coast's most confidential proprietary information. It allowed

him to supervise its employees, and to retain others in China to advance its interests on a confidential

basis. He had an obligation to act with the highest degree of honesty and loyalty toward Coast to

Coast and in the best interests of Coast to Coast.

65. Defendant Yagelski had a duty to disclose to Coast to Coast information which was

relevant to the affairs entrusted to him.

66. Defendant Yagelski had a duty toward Coast to Coast that prohibited him from

discharging the duties of his position in such a manner as to make a secret profit for himself.

67. Defendant Yagelski had a duty not to exploit his position within the company for his

own benefit.

68. He had the duty not to hinder the ability of Coast to Coast to continue the business for

which it was developed.

69. Defendant Yagelski had the duty to disclose to Coast to Coast all material facts, fully

and completely before acting for his own benefit within the scope of his duties.

70. Defendant Yagelski repeatedly breached his fiduciary duties to Coast to Coast. He

formulated and executed a business plan to compete with Coast to Coast while still employed by it.

Defendant Yagelski, along with Defendant Billy Musgrove, actively prepared documents, and sales

pitches to be used to solicit what otherwise should have been prospective customers of Coast to

Coast at the GIA Symposium. Worse than that, they used trusting Coast to Coast employees to

effectuate their plan. These documents were prepared on Coast to Coast computers during regular

working hours.

71. As a direct and proximate result of Defendant Yagelski's breaches of fiduciary duties,

Coast to Coast has been damaged and continues to suffer damages.

72.    Coast to Coast has no adequate remedy at law.  Money damages alone will not, and cannot, compensate Coast to Coast for the loss of goodwill, or the loss of business opportunities which Coast to Coast will suffer as a result of Defendant Yagelski's conduct.  Money damages will not compensate for the continuing injury resulting from his misuse of confidential, proprietary, technical, work product of Coast to Coast employees, and other technical consultants, enlisted to advance Coast to Coast's development and marketing of the unique app conceived by Coast to Coast's founder.

73.    By his conduct, Defendant Yagelski has demonstrated his willingness to continue to engage in acts which harm Coast to Coast.  It is clear that the injury to Coast to Coast is immediate, irreparable and continuing.

74.    Coast to Coast has demonstrated that Defendant Yagelski has, and unless restrained will continue to, engage in conduct alleged herein.

75.    There is a likelihood that Coast to Coast will prevail on the merits of this action.

76.    Should the Court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Yagelski will be slight compared to the injury to Coast to Coast, if it is not granted.  No injury to Defendant Yagelski will result from an order that requires him to comport his actions to the law. Hence, Coast to Coast should not be required to post a bond. If a bond is required, it should be in a nominal amount.

77.    The granting of an injunction will not disserve the public interest.

WHEREFORE, Coast to Coast prays for the following relief against Defendant Defendant Yagelski:

19

a.  Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Yagelski enjoining and restraining him from (1) continuing to use property of Coast to Coast, (2) requiring him to immediately turn over any Coast to Coast property to Coast to Coast, (3) soliciting customers or prospective customers of Coast to Coast, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to Coast to Coast including information given by Coast to Coast to consultants and vendors.

b.  The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with Coast to Coast.

c.  Compensatory damages in an amount yet to be determined, but not less than $500,000.

d.  Exemplary damages in an amount to be determined at trial.

f.  Such further and additional relief as the Court may deem appropriate.

## COUNT II
## BREACH OF FIDUCIARY DUTY
## (BILLY MUSGROVE)

78.  Coast to Coast realleges paragraphs 1 through 62 as though fully set forth herein.

79.  At all relevant times during the period during which Billy Musgrove acted as a consultant to Coast to Coast, he was a fiduciary of Coast to Coast. He had an obligation to act with the highest degree of honesty and loyalty toward Coast to Coast and in the best interests of Coast to Coast. Musgrave supervised the work of certain Coast to Coast developers, provided detailed instructions to the developers on a daily basis, and was paid $1,500 per week for his work.

80.  As a fiduciary of Coast to Coast, Defendant Musgrove had a duty to inform the company that Defendant Yagelski was engaged in other fiduciary breaches.

81.  Defendant Musgrove had a duty to disclose to Coast to Coast information that was

relevant to the affairs entrusted to him.

82.     Defendant Musgrove had a duty toward Coast to Coast that prohibited him from discharging the duties of his position in such a manner as to make a secret profit for himself, or to assist another fiduciary to do so.

83.     Defendant Musgrove had a duty not to exploit his position as a fiduciary for his own benefit.

84.     Defendant Musgrove had the duty not to hinder the business of Coast to Coast to continue the business for which it was developed.

85.     Musgrove had the duty to disclose to Coast to Coast all material facts, fully and completely before acting for his own benefit within the scope of his duties.

86.     As alleged above, Defendant Musgrove was a fiduciary of Coast to Coast. Musgrove joined a conspiracy with Robert T. Yagelski to subvert the interests of Coast to Coast with its prospective customers.  Defendant Musgrove and Yagelski actively conspired to compete with Coast to Coast by formulating a plan to leave Coast to Coast with its unique and proprietary software and claim that it was created and owned by ClaimMate, the trade name of Defendant Yagelski, under which they intended to market the software.  Defendant Musgrove enlisted guiltless employees at Coast to Coast to create a 2-D video for the purpose of marketing the software to prospective customers, claiming it was owned by ClaimMate, when in truth and in fact, it was owned by Coast to Coast. Defendant Musgrove enlisted those same employees to create an email marketing campaign for ClaimMate in which it claimed ownership of the valuable software that belonged to Coast to Coast.    Defendant Musgrove hid his actions by engaging in secret meetings at the offices of Coast to Coast with Defendant Yagelski and Ray Yagelski to move their secret project forward. On

21

information and belief, Defendant Musgrove was fully aware that he and Defendant Yagelski would be leaving Coast to Coast prior to the GIA Symposium. In spite of the knowledge, Defendant Musgrove caused Coast to Coast to book and prepay a room at the Embassy Suites in Des Moines to be used by Defendant Yagelski. This resulted in Coast to Coast underwriting part of the cost of the trip on behalf of Defendant Yagelski acting under the trade name ClaimMate.

87.     As a direct and proximate result of Defendant Musgrove's breaches of fiduciary duties, Plaintiff Coast to Coast has been damaged and continues to suffer damages.

88.     Coast to Coast has no adequate remedy at law.  Money damages alone will not, and cannot, compensate Coast to Coast for the loss of goodwill, or the loss of business opportunities which Coast to Coast will suffer as a result of Defendant Musgrove's conduct. Money damages will not compensate for the continuing injury resulting from Defendant Musgrove's misuse of confidential, technical, proprietary software.

89.     By his conduct, Defendant Musgrove has demonstrated his willingness to continue to engage in acts that harm Coast to Coast.  It is clear that the injury to Coast to Coast is immediate, irreparable and continuing.

90.     Coast to Coast has demonstrated that Defendant Musgrove has, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that Coast to Coast will prevail on the merits of this action.

91.     Should the Court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Musgrove will be slight compared to the injury to Coast to Coast, if it is not granted.  No injury to Defendant Musgrove will result from an order which requires Defendant Musgrove to comport his actions to the law, hence Coast to Coast should not be required to post a bond. If the

court does require a bond, it should be in a nominal amount.

92. The granting of an injunction will not disserve the public interest.

WHEREFORE, Coast to Coast prays for the following relief against Defendant Musgrove:

    a.    Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Musgrove enjoining and restraining him from (1) continuing to use property of Coast to Coast, (2) requiring him to immediately turn over any Coast to Coast property to Coast to Coast, (3) soliciting customers or prospective customers of Coast to Coast, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to Coast to Coast including information given by Coast to Coast to consultants and vendors.

    b.    The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with Coast to Coast.

    c.    An order requiring Defendant Musgrove to make restitution to Coast to Coast.

    d.    Compensatory damages in an amount yet to be determined, but not less than $500,000.00.

    e.    Exemplary damages in an amount to be determined a trial.

    f.    Such further and additional relief as the Court may deem appropriate.

## COUNT III
## CONSPIRACY TO BREACH FIDUCIARY DUTY
## (RAYMOND YAGELSKI AND BILLY MUSGROVE)

93. Coast to Coast realleges paragraphs 1 through 62 as though fully set forth herein.

94. Defendant Yagelski and Musgrove acted in concert and conspired together to breach their fiduciary duties to Coast to Coast. At a time when Defendant Yagelski was retained as a full-time project director at Coast to Coast to oversee and advance the creation of proprietary software, as

alleged above, Defendant Yagelski and Musgrove formulated and executed a business plan to compete with Coast to Coast while still employed by it. That plan included converting the software developed and paid for by Coast to Coast. Defendant Yagelski and Musgrove subverted the interests of Coast to Coast by creating and implementing a plan that misrepresents Coast to Coast's ownership of the software it developed by marketing it as ClaimMate's to customers and prospective customers. Yagelski actively implemented that plan by denying access to the software owned by Coast to Coast, by developing marketing ideas, including sales pitches to be used to solicit what should have been prospective Coast to Coast customers. The conduct complained of constitutes overt acts in furtherance of the conspiracy by Defendants Yagelski and Musgrove. Said acts were tortious and unlawful in character. On numerous occasions, Defendants Yagelski and Musgrove met behind closed doors to the exclusion of other Coast to Coast employees.

95. As fiduciaries of Coast to Coast, Defendants had a duty to inform Coast to Coast of the misconduct of their co-conspirator relation to the other's use of Coast to Coast's technology, including the source code and app to market the products to investors and potential customers by claiming that they owned the technology.

96. Defendants had a duty to disclose to Coast to Coast information which was relevant to the affairs entrusted to them.

97. Defendants had a duty toward Coast to Coast that prohibited them from discharging the duties of their positions in such a manner as to make a secret profit for themselves.

98. Defendants had a duty not to exploit their position within the company for their own benefit.

99. Defendants had the duty not to hinder the business of Coast to Coast to continue the

business for which it was developed.

100.    Defendants had the duty to disclose to Coast to Coast all material facts, fully and completely before acting for their own benefit within the scope of their duties.

101.    The wrongful acts alleged herein constitute acts in furtherance of a conspiracy.

102.    As a direct and proximate result of the aforementioned conspiracy, Coast to Coast has been damaged and continues to suffer damages.

103.    Coast to Coast has no adequate remedy at law.  Money damages alone will not, and cannot, compensate Coast to Coast for the loss of goodwill, or the loss of business opportunities which Coast to Coast will suffer as a result of Defendants Yagelski and Musgrove's conduct.  Money damages will not compensate for the continuing injury resulting from Defendants Yagelski and Musgrove's use of confidential, technical, marketing and financial information.

104.    By their conduct, Defendants Yagelski and Musgrove have demonstrated their willingness to continue to engage in acts which harm Coast to Coast.  It is clear that the injury to Coast to Coast is immediate, irreparable and continuing. The GIA Symposium will take place in the coming days.  Defendants intend to reap the rewards of Coast to Coast's investment of time, money and intellectual capital by marketing the software at that symposium.

105.    Coast to Coast has demonstrated that Defendant Yagelski and Musgrove have, and unless restrained will continue to, engage in conduct which is alleged herein.  There is a likelihood that Coast to Coast will prevail on the merits of this action.

106.    Should the Court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Yagelski and Musgrove will be slight compared to the injury to Coast to Coast if it is not granted.  No injury to Defendant Yagelski and Musgrove will result from an order that requires them

to comport their actions to the law.

107.   The granting of an injunction will not disserve the public interest.

WHEREFORE, Coast to Coast prays for the following relief against Defendant Yagelski and Musgrove, and each of them:

a.   Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Yagelski and Musgrove enjoining and restraining them from (1) continuing to use property of Coast to Coast, (2) requiring them to immediately turn over any Coast to Coast property to Coast to Coast, (3) soliciting customers or prospective customers of Coast to Coast, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to Coast to Coast including information given by Coast to Coast to suppliers and vendors.

b.   The imposition of a constructive trust on any monies that have been or will be derived from any business venture wrongfully in competition with Coast to Coast.

c.   An order requiring Yagelski and Musgrove to make restitution to Coast to Coast.

d.   A judgment of compensatory damages in an amount yet to be determined, but not less than $500,000.00, jointly and severally.

e.   Exemplary damages to be assessed severally against each defendant at trial.

f.   Such further and additional relief as the Court may deem appropriate.

## COUNT IV
## FRAUD
## (DEFENDANT YAGELSKI)

108.   Coast to Coast realleges paragraphs 1 through 62 as though fully set forth herein.

109.   Defendant Yagelski made numerous statements to Coast to Coast from March 2021 through his termination on August 25, 2021. In none of those statements did he disclose the wrongful

conduct alleged herein, though he had an affirmative duty to do so.

110.    Defendant Yagelski's failure to report the wrongful conduct of himself and his co-Defendant were material omissions of fact.

111.    Defendant Yagelski's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

112.    His material omissions in his reports were done for the purpose of inducing Coast to Coast not to act, because had Coast to Coast known of his and his co-Defendant's wrongful conduct, it would have fired them immediately instead of doing so when Coast to Coast unilaterally learned about the improper conduct in August 2021.

113.    Coast to Coast acted in reliance on the statements and omissions of Defendant Yagelski, and its reliance was reasonable.

114.    Coast to Coast has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Yagelski's false representations and omissions.

115.    Coast to Coast has no adequate remedy at law.  Money damages alone will not, and cannot, compensate Coast to Coast for the loss of goodwill, or the loss of business opportunities which Coast to Coast will suffer as a result of Defendant Yagelski's conduct.  Money damages will not compensate for the continuing injury resulting from his use of confidential, technical, marketing and financial information.

116.    By his conduct, Defendant Yagelski has demonstrated his willingness to continue to engage in acts which harm Coast to Coast.  It is clear that the injury to Coast to Coast is immediate, irreparable and continuing.

117.    Coast to Coast has demonstrated that Yagelski has, and unless restrained will

continue to, engage in conduct alleged herein.

118.    There is a likelihood that Coast to Coast will prevail on the merits of this action.

119.    Should the Court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Yagelski will be slight compared to the injury to Coast to Coast if it is not granted.  No injury to Defendant Yagelski will result from an order which requires him to comport his actions to the law, hence Coast to Coast should not be required to post a bond.

120.    The granting of an injunction will not disserve the public interest.

WHEREFORE, Coast to Coast prays for the following relief against Defendant Yagelski:

a.      Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Yagelski enjoining and restraining him from (1) continuing to use property of Coast to Coast, (2) requiring him to immediately turn over any Coast to Coast property to Coast to Coast, (3) soliciting customers or prospective customers of Coast to Coast, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to Coast to Coast including information given by Coast to Coast to suppliers and vendors.

b.      The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with Coast to Coast.

c.      An order requiring Defendant Yagelski to make restitution to Coast to Coast including his consultant payments dating from the time of the alleged breach, but not later than March 2021.

d.      Compensatory damages in an amount yet to be determined, but not less than $500,000.00.

e.      Exemplary damages of not less than $500,000.00.

f.      Such further and additional relief as the Court may deem appropriate.

**COUNT V**
**FRAUD**
**(BILLY MUSGROVE)**

121.    Coast to Coast realleges paragraphs 1 through 62 and 108 through 120 as though fully set forth herein.

122.    Defendant Musgrove made numerous misrepresentations to Coast to Coast from July 2021 through his termination in August 2021. In none of those reports did he disclose the wrongful conduct alleged herein, through he had an affirmative duty to do so.

123.    Defendant Musgrove's failure to report the wrongful conduct of himself and his co-Defendant were material omissions of fact.

124.    Defendant Musgrove's failure to report the wrongful conduct was an effort on his part to misrepresent the state of affairs of the company.

125.    Defendant Musgrove's material omissions in his reports were done for the purpose of inducing Coast to Coast not to act, because had Coast to Coast known of Musgrove's and his co-Defendant's wrongful conduct, it would have fired them immediately instead of doing so when Coast to Coast unilaterally learned about the improper conduct in August 2021.

126.    Coast to Coast acted in reliance on the statements and omissions of Musgrove and its reliance was reasonable.

127.    Coast to Coast has been injured and continues to suffer injuries as a direct and proximate result of its reliance on Defendant Musgrove's false representations and omissions.

128.    Coast to Coast has no adequate remedy at law.  Money damages alone will not, and cannot, compensate Coast to Coast for the loss of goodwill, or the loss of business opportunities which Coast to Coast will suffer as a result of Defendant Musgrove's conduct.  Money damages will not compensate for the continuing injury resulting from Musgrove's use of confidential, technical, marketing and financial information.

129. By his conduct, Defendant Musgrove has demonstrated his willingness to continue to engage in acts which harm Coast to Coast. It is clear that the injury to Coast to Coast is immediate, irreparable and continuing.

130. Coast to Coast has demonstrated that Defendant Musgrove has, and unless restrained will continue to, engage in conduct alleged herein.

131. There is a likelihood that Coast to Coast will prevail on the merits of this action.

132. Should the Court grant interlocutory injunctive relief to Coast to Coast, the burden on Defendant Musgrove will be slight compared to the injury to Coast to Coast if it is not granted. No injury to Defendant Musgrove will result from an order which requires Defendant Musgrove to comport his actions to the law, hence Coast to Coast should not be required to post a bond.

133. The granting of an injunction will not disserve the public interest.

WHEREFORE, Coast to Coast prays for the following relief against Defendant Musgrove:

a. Entry of a temporary restraining order, and preliminary and permanent injunctions against Defendant Musgrove enjoining and restraining him from (1) continuing to use property of Coast to Coast, (2) requiring him to immediately turn over any Coast to Coast property to Coast to Coast, (3) soliciting customers or prospective customers of Coast to Coast, or assisting any third party from doing so, and (4) using any confidential or proprietary information belonging to Coast to Coast including information given by Coast to Coast to suppliers and vendors.

b. The imposition of a constructive trust on any monies that have been or will be derived from any business venture in competition with Coast to Coast.

c. An order requiring Defendant Musgrove to make restitution to Coast to Coast including his consultant payments dating from the time of the alleged breach, but not later than July 2021.

d. Compensatory damages in an amount yet to be determined, but not less than $500,000.00.

e.      Exemplary damages of not less than $500,000.00.

f.      Such further and additional relief as the Court may deem appropriate.

August 30, 2021

                                  Respectfully submitted,

                                  COAST TO COAST CLAIM SERVICES, INC.,
                                  Plaintiff

                        By:   /s/William G. Sullivan
                               One of Its Attorneys

William G. Sullivan (ARDC No. 2773538)
Timothy R. Herman (ARDC No. 6301721)
Clark Hill PLC
130 E. Randolph St., Ste. 3900
Chicago, Illinois 60601

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Coast to Coast Claim Services, Inc., | ) | |
| a Nevada Corporation, | ) | |
| | ) | No. 21 cv |
| Plaintiff, | ) | |
| | ) | Hon., |
| v. | ) | Judge Presiding |
| | ) | |
| Raymond T. Yagelski, III, an individual, | ) | Hon. |
| Billy Musgrove, an individual, and | ) | Magistrate Judge |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF MAJDY "MICHAEL" BADER
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

1.     Majdy "Michael" Bader, as provided in 28 USC §1746, states as follows.

2.     I am the Owner and President of Coast to Coast Claim Services, Inc. ("Coast to Coast").

3.     I have read the Verified Complaint filed in this action, and have knowledge of the facts contained in paragraphs 1-4, 7-26, 30, 37, 39, 40, 44, 46-57, and 70.

4.     The business records for Coast to Coast are kept in the normal and ordinary course of business by someone with knowledge, the records are kept in the ordinary course of business, and the making of that record was regular practice of that activity.

5.     I declare under penalty of perjury that the foregoing is true and correct.

_____
Majdy "Michael" Bader

Executed in Chicago, Illinois on August 30, 2021.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Coast to Coast Claim Services, Inc., | ) | |
| a Nevada Corporation, | ) | |
| | ) | No. 21 cv |
| Plaintiff, | ) | |
| | ) | Hon., |
| v. | ) | Judge Presiding |
| | ) | |
| Raymond T. Yagelski, III, an individual, | ) | Hon. |
| Billy Musgrove, an individual, and | ) | Magistrate Judge |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF JERRY SIMONELLI
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

1. Jerry Simonelli, as provided in 28 USC §1746, states as follows.

2. I am the Office Manager of Coast to Coast Claim Services, Inc. ("Coast to Coast").

3. I have read the Verified Complaint filed in this action, and have knowledge of the facts contained in paragraphs 23-25, 37, and 48-49.

4. I declare under penalty of perjury that the foregoing is true and correct.

Jerry Simonelli

Executed in Chicago, Illinois on August 30, 2021.

.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Coast to Coast Claim Services, Inc., | ) | |
| a Nevada Corporation, | ) | |
| | ) | No. 21 cv |
| Plaintiff, | ) | |
| | ) | Hon., |
| v. | ) | Judge Presiding |
| | ) | |
| Raymond T. Yagelski, III, an individual, | ) | Hon. |
| Billy Musgrove, an individual, and | ) | Magistrate Judge |
| | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF ROBERT SIMON
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND
<u>PRELIMINARY INJUNCTION</u>**

      1.     Robert Simon, as provided in 28 USC §1746, states as follows.

      2.     I am employed as a software developer by Coast to Coast Claim Services, Inc.

("Coast to Coast").

      3.     I have read the Verified Complaint filed in this action, and have  knowledge of the

facts contained in paragraphs 20, 22, 25, 28, 31-36, 38, 40, 43, 45, and 49.

      4.     I declare under penalty of perjury that the foregoing is true and correct.




_____
Robert Simon

Executed in Chicago, Illinois on August 30, 2021.

.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Coast to Coast Claim Services, Inc.,    )
a Nevada Corporation,    )
    )    No. 21 cv
    Plaintiff,    )
    )    Hon.,
    v.    )    Judge Presiding
    )
Raymond T. Yagelski, an individual,    )    Hon.
Billy Musgrove, an individual, and    )    Magistrate Judge
    )
    )
    Defendants.    )

**DECLARATION OF CHARLES DONOVAN
IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

1.    Charles Donovan, as provided in 28 USC §1746, states as follows.

2    I am employed as a software developer by Coast to Coast Claim Services, Inc. ("Coast to Coast").

3.    I have read the Verified Complaint filed in this action, and have knowledge of the facts contained in paragraphs 20, 22, 25, 27, 28, 29, 31, 32, 38, 40-43, 45, and 49.

4.    I declare under penalty of perjury that the foregoing is true and correct.

_Charles Donovan_
Charles Donovan

Executed in Chicago, Illinois on August 30, 2021.

# EXHIBIT 1

CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

THIS CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT ("Agreement"), is made and entered into on ~~~~~~~~~~ (the "Effective Date"), by and between ZOOM MANAGEMENT, INC. and COAST TO COAST CLAIMS, INC. and ~~~~~~~~~~~~~ and each of them may be individually referred to herein as a "party," or collectively as the "parties."

WITNESSETH:

WHEREAS, the parties wish to pursue and expect to continue to pursue discussions (the "Discussions") related to a potential business relationship (the "Objective"); and

WHEREAS, in the course of continuing the Discussions, and in the course of any subsequent business relationship, the parties may disclose to one another, or the principals, partners, shareholders, directors, officers, employees, representatives, professional advisors, or agents (collectively the "Representatives") of each other, certain information of a proprietary and confidential nature; and

WHEREAS, the parties (each, as applicable, a Recipient and a Disclosing Party) desire to protect the Confidential Information (as hereinafter defined) of each party, both during and subsequent to the Discussions.

NOW THEREFORE, in consideration of the premises and the mutual promises hereinafter set forth and other good and valuable consideration, the parties agree as follows:

1    Confidential Information.    For the purposes of this Agreement, "Confidential Information" shall include without limitation:

   1.1.    the occurrence of the Discussions and the exchange of information relative to the Discussions and the Objective;
   1.2.    customer lists and information,
   1.3.    business and marketing plans, developments, and strategies;
   1 4.    financial statements, projections, analyses, and information related to costs and revenues;
   1.5.    computer source and object code and related technical information including without limitation all algorithms, codes, and documentation relating thereto;
   1.6.    product and equipment designs, concepts, specifications or enhancements and other technological developments, and production techniques whether or not they are the subject of statutory trade secret protection, patents, or pending patent applications, and
   1.7    all other information provided by the parties of a proprietary and confidential nature (whether communicated by means of oral, visual, or written disclosures, and whether or not identified as or marked "confidential").

2. Protection of Confidential Information. Each party shall maintain the Confidential Information of the other party using at least those measures as it accords its own information of a similar nature and, in any event, shall exercise such care in protecting the Confidential Information of the other party as a reasonably prudent person would exercise. Each party further agrees that the Confidential Information of the other party shall be used solely for the purposes of engaging in the Discussions and evaluating the Objective (the "Permitted Purposes") and, except for such limited purposes, such information shall not be used for its own benefit or be disclosed to any third party. Each party may disclose the Confidential Information of the other only to its Representatives solely for the Permitted Purposes, provided that each Representative must agree to comply with and be bound by the terms of this Agreement and that each party shall be liable for the acts of its Representatives and any and all other persons to whom it discloses the Confidential Information of the other party.

3. Patent Matters. The parties agree and intend that, as to any potentially patentable information disclosed pursuant to this Agreement that has not heretofore been publicly disclosed, the disclosure of any such information is for discussion and preliminary experimental test purposes only, is a non-public use and precludes any public use of such information, and is in no way an offer to sell such information or any devices making use of such information.

4. Non-Confidential Information. "Confidential Information" shall in no event include, and nothing in this Agreement shall prevent either party's use or disclosure of, any information which:

   4.1. was in the possession of the Recipient at or prior to the time it was first disclosed by the Disclosing Party pursuant to this Agreement; provided that, upon receipt of such Confidential Information, the Recipient promptly furnishes the Disclosing Party with evidence of such prior possession;

   4.2 was in the public domain at the time it was disclosed to the Recipient;

   4.3 enters the public domain through sources independent of the Recipient and through no fault of the Recipient;

   4.4. is made available by the Disclosing Party to a third party on an unrestricted, nonconfidential basis;

   4.5. was at any time developed by the Recipient or its Representatives independently of any disclosure by the Disclosing Party, provided that, upon the completion of such development, the Recipient promptly furnishes the Disclosing Party with evidence of such independence.

5. Non-Circumvention. Parties agree to keep confidential the names of any Contacts that include, without limitation, vendors, clients, or contractors introduced or revealed to the Recipient, and the Recipient shall not contact, deal with, negotiate or participate in any transactions with any of the Contacts without first entering a written agreement

with the Disclosing Party who provided such Contact unless the Disclosing Party gives prior written permission. Such confidentiality protections will include any names, addresses, telephone, telex, facsimile numbers, and/or other pertinent information disclosed or revealed to the Recipient. In case of circumvention and in addition to any other remedies, the Parties agree and guarantee that they will pay a legal monetary penalty that is equal to the commission, fee, or lost profits the circumvented Disclosing Party should have realized in such transactions, by the person(s) engaged on the circumvention for each occurrence.

6.  Subsidiaries and Affiliates. Each party agrees that its obligations contained herein apply also to, and are binding upon, all of its parent, subsidiary and affiliated companies, if any, and the successors and permitted assignees of any of such entities (collectively the "Affiliates").

7   New Business Ventures. Each party acknowledges that the other party may be presently engaged in the development or implementation of business operations and technology of the same kind and nature as may be the subject of disclosure of information pursuant to this Agreement  No disclosure pursuant to this Agreement shall in any way obligate either party to discontinue its involvement in such business(es).

8.  Compliance. In the event that either party, its Representatives, or Affiliates is legally compelled (by oral questions, interrogatories, requests for information or documents, subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the party under such compulsion shall, to the extent permitted by law, promptly give notice to the Disclosing Party so that the Disclosing Party may seek to quash such compulsion or to obtain an appropriate protective order. In the event the Disclosing Party does not quash such compulsion, and whether or not a protective order is obtained, the party under compulsion shall disclose only such limited portion of the Confidential Information of the other party as, in the written opinion of counsel for the party under compulsion, is required to avoid sanction by the court having jurisdiction of such matter.

9.  Termination. This Agreement shall terminate three (3) years from the date hereof unless superseded by the terms of a definitive agreement relating to the Objective.

10. Return of Materials  In the event the Discussions are terminated, whether or not the Objective, or any portion thereof, has been accomplished, each party shall promptly return or destroy all documentation and other materials containing any Confidential Information of the other party without retaining any copies thereof. Each party shall thereafter, upon request by the other, provide a certification signed by an officer that all such materials have been returned to the originating party or have been destroyed. Notwithstanding anything to the contrary and subject to the confidentiality obligations herein, the Recipient Party may retain on a confidential basis copies of all

Confidential Information in order to comply with legal or regulatory requirements, as well as any and all (A) emails and any attachments contained in such emails, and (B) any electronic files, each of which are automatically saved pursuant to legal or regulatory requirements.

11. <u>Entire Agreement</u>  This Agreement sets forth the entire agreement and understanding among the parties as to the subject matter hereof, and merges and supersedes all prior discussions, agreements, and understandings of every kind and any nature among them. This Agreement shall be effective only when signed by all of the parties on the signature pages (or counterpart signature pages hereto). This Agreement may not be amended, supplemented, changed, or modified, except by agreement in writing signed by the parties to be bound thereby.

12. <u>Binding Agreement</u>. This Agreement shall be binding upon the parties and their respective successors and assigns  No party hereto shall assign or transfer any of its rights or obligations hereunder without the prior written consent of the other party, which may be granted or withheld in the sole discretion of such other party.

13 <u>Non-Waiver</u>  The waiver by any party of any other party's non-compliance with any obligation or responsibility herein shall be ineffective unless given in writing and shall not be deemed a waiver of other instances of non-compliance or of any party's remedies for such non-compliance.

14. <u>Disclosure of Agreement</u>. Each Party shall have the right to disclose this Agreement and notify any potential contracting entity or any party related to or associated with an actual or potential breach of this Agreement

15. <u>Remedies</u>. It is recognized that damage in the event of a breach of the Party's covenants under this Agreement will be difficult, if not impossible, to ascertain. It is therefore agreed that the non-breaching Party, in addition to or without limiting any other remedy or right that it might have, shall have the right to·

15 1. An injunction against the breaching Party issued by a court in the venue specified in Section 18 of competent jurisdiction enjoining such breach. Each Party hereby consents to the issuance of any preliminary or permanent injunction without limitation and without bond; and

15.2. An award of the prevailing Party's reasonable attorneys' fees and costs of enforcement or legal action incurred in protecting its interests under this Agreement and enforcing or attempting to enforce this Agreement that results in a money judgment or an injunction, including but not limited to reasonable attorneys' fees (including fees related to the services of in-house counsel) incurred in litigation, voluntary arbitration, trial, in all appellate courts, and the costs and attorneys' fees related to the collection of any amounts awarded by a

court or arbitrator, without limitation to manner or form against the breaching Party; and

15.3. Any other remedy provided by law, including monetary damages, which is not inconsistent with the remedies set forth above.

16. <u>Savings Clause</u>  In case any provision contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and this Agreement shall be construed as if provision had never been contained herein. All confidentiality provisions and restrictive covenants shall survive the termination of this agreement

17. <u>Survival</u>. The restrictions set forth in this Agreement shall survive the conclusion of any financial or business relationships between the Parties and shall remain in effect indefinitely with respect to any information obtained by either Party that constitutes a trade secret, unless and until such information no longer constitutes or contains any trade secret as defined by statute.

18  <u>Choice of Law and Venue of Action</u>. This Agreement shall be governed by and construed in accordance with the laws of ░░░░Each of the Parties hereto irrevocably submits to the personal jurisdiction of the state or federal courts located in ░░░░░ ░░░░░░ With respect to any litigation arising out of this Agreement, the parties expressly waive any right they may have to a jury trial and agree that any such litigation shall be tried by a judge without a jury

19  <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

20  <u>Electronic Signatures</u>  Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and have the same force and effect as manual signatures. Electronic signature means any electronic symbol or process attached to or logically associated with a record and executed and adopted by a party with the intent to sign such record, including, without limitation, Adobe e-signature, DocuSign, E-sign, facsimile, or e-mail electronic signatures.

21.  <u>Securities Disclosure</u>. The Parties hereto represent and warrant that neither Party has made an offer for the sale of securities and nothing herein should be construed as a solicitation, recommendation or an offer to buy or sell any securities.  The Parties have made no representations that the Parties may engage in a future transaction. While a future transaction may occur between the Parties, there has not been an offer upon which any Party could accept.  Nothing herein shall obligate either Party to continue the Discussions or to enter into, or consummate, any transaction related to

the Objective.

[Blank Space Prior to Signature Page]

<u>SIGNATURE PAGE</u>

CONFIDENTIALITY AND NON-DISCLOSURE AGREEMENT

IN WITNESS WHEREOF, the parties have entered into and ratify this Agreement as of the Effective Date.

_Ray Uagchski_

ZOOM MANAGEMENT, INC, and
COAST TO COAST CLAIMS, INC.

By

Its: _____

By _____

Name: ~~Daniel Gallagher~~ Michael Bidler
Its: President

8/5/2021

Dated: 3/5/2021

\*\*\*

# EXHIBIT 2

DRAFT #1

Text for email campaign to potential customers

RE: **Efficiency through Automation**

# *Let our Technology make your life easier*

ClaimMate leverages ***proprietary*** technology to provide you with automated photo labeling, photo to report integration, and flexible report formatting.

- **AUTOMATICALLY-LABELED PHOTOS**. Our proprietary camera software allows you to label each picture as it's taken, providing you with more accurate and detailed photos. We've streamlined the process so well that no writing or typing is involved on our photos.
- **SEAMLESS INTEGRATION**. With ClaimMates proprietary technology evolving every day, we've now modernized report filing. Our camera app can integrate straight with your report, meaning the photos you take will fill out the report for you.
- **XACTIMATE, HTML, OR WORD REPORT FORMATS**. Our Report Application will allow you to implement your own custom report format, so you can receive the report your way. We can even populate your report directly into your Xactimate software.

Reach out to me so we can show you how efficient our technology really is!

Billy Musgrove
ClaimMate, LLC
(877) 270-7707 ext. 105
musgroveb@c2c.claims

# EXHIBIT 3

## 2D Whiteboard Sketch Video

1. Introduce the character
   a. Billy is your everyday Insurance Adjuster. He wakes up and is ready to begin adjusting his claims.
2. Inspection Process
   a. Once Billy arrives at the location, he does his necessary greetings and begins inspecting. He takes all the necessary photos and mentally prepares to write his report.
3. Back in the Car
   a. After the inspection, Billy heads to his car, writes his long report and heads to his next inspection.
4. Home
   a. With Billy's long day over, he is now home to write his reports and label his photos. After multiple stressful hours of remembering where he was at each location, what his photos were about, and finalizing his reports, Billy is finally able to rest.
   b. Note the importance of said time.
5. Solution
   a. What if we told you Billy didn't have to spend multiple hours remembering and labelling his information. A solution that saves time, reduces stress, and removes the pain of having to memorize individual details.
   b. In comes ClaimMate, a revolutionary software that manages your reports and photos from the freedom of your Smartphone or Tablet.
6. New Inspection Process
   a. With the apps installed, Billy can work stress free knowing his time is well spent. Using the ClaimMate Camera, Billy can label his photos on site without having to type or write anything. Not only that, the photos he takes integrate with the Report App, automatically filling out the report for him.
7. Back in the Car
   a. Once the inspection is over, Billy can head to his car and finalize his report and photos with no hassle, before submitting and enjoying his new found free time.

# EXHIBIT 4

# Elevator Pitch

Bobby's : [
The current insurance industry is bogged down by low end technology, increasing time and reducing efficiency.

ClaimMate is an all in one software that solves these failures by using proprietary technology. 100s of adjusters have used it for years, completing thousands of claims.

We're the only company that holds all the pieces, and if you want to ride the road to fame, join now.
]

Charles . [
We've got hundreds of adjusters who are doing claims three times faster than anyone else, and we need investors.
]

Ray IV · [
More money, more time, less work,
claimmate.
We are the new Netflix,
join now or get left,
bitch!
]

First Compromise
{
The current insurance industry is slowed down by low end technology, an abundance of unnecessary time and inefficiency.

ClaimMate is a unique all in one software that is able to correct these flaws by using proprietary technology. 100s of adjusters have used it for years, completing thousands of claims at a rate unmatched .

We're the only company that holds all the pieces, join us as we are the first to break through and this industry
}

Second Compromise
{

The Claims Industry is bottlenecked by the people who perform inspections. Our apps have allowed a hundred adjusters to work at triple the speed of everyone else. Invest in us, and we can turn a billion dollar industry into a three billion dollar industry. The sooner you invest, the more of that will go into your pocket.
}

# Social Media Marketing Plan

Goal - Spread awareness of ClaimMate's app
Audience - Investors, Adjusters, & Insurance Companies.
Platforms -
1. Facebook
    a. Adjuster Groups
    b. Investment Groups
2. LinkedIn
    a. Everyone. (Build networks. Make friends.)
3. Twitter
    a. Make bobby do it
4. Instagram
    a. Make an account, post videos about the app  Promote the account.
5. TikTok
    a. Make videos about the app.
6  Youtube
    a. Make videos.
7. Commercials/Ads
    a  Make videos.
Message -
1. Investors - Our app has the potential to take market share and make large returns on early investment.
2. Adjusters - We can help you get more claims done with a lot less of your time.
3. Insurance Companies - We can help you process more claims with fewer adjusters.
    a. Problem - Time/Money Efficiency
    b. Solution - ClaimMate
    c. Why Trust - It's tested with thousands of claims.
    d. Value - All the pieces

# Surveys

https://docs.google.com/document/d/1QXnakeB-nWTqE8w7aOgP_RGr6EMlJ15LhfvCPguIIaE/edit?usp=sharing

# EXHIBIT 5

 **Clark Hill**

William G. Sullivan
T (312) 360-5005
F (312) 517-7576
Email WSullivan@ClarkHill.com

Clark Hill
130 E. Randolph Street, Suite 3900
Chicago, Illinois 60601
T AuthorOfficeGeneralNo1
F (312) 985-5999

August 26, 2021

*via FedEx and E-mail to: claimzapp@gmail.com, ray.claims@gmail.com and largelossadjuster@gmail.com*

Raymond Theodore Yagelski
524 Fox Point Drive
Chesterton, Indiana 46304

Re: <u>**TECHNOLOGY OWNERSHIP – COAST TO COAST, INC.**</u>

Dear Mr. Yagelski:

On behalf of Coast to Coast, Inc., we have been asked to clarify the rights and obligations concerning certain technology developed by or for Coast to Coast, Inc. and its affiliated entities ( "Coast to Coast" or the "Company"). This technology is described below and is referred to as the "Company Technology." Specifically, we want to clarify that the Company Technology belongs to Coast to Coast.

As you are aware, Mr. Bader, on behalf of the Company, developed technology to engage in the business of linking insurance inspectors and other specialized service providers with national and regional insurance companies, adjusters, and related individuals and entities ("Business"). The Company employed you as a consultant to manage the project to develop the Company Technology on behalf of the Company in connection with the business. The Company paid you $1,500 per week to manage the project. The Company paid all outside developers that you brought into the project. You worked from Coast to Coast offices, you used its computers. You used a Coast to Coast cell phone. Accordingly, any Company Technology that was developed while you were retained by the Company, by operation of law, became the property of the Company as "works for hire." The fact that the Company has paid all sums associated with the development of this Company Technology is proof that the Company owns the Company Technology and any other inventions and patentable, trademarkable and copyrightable developments that relate to or arise out of the Business of the Company.

Moreover, while working for the Company, you owed a duty of loyalty, fidelity and allegiance to always act in the best interests of the Company and to refrain from doing anything on your own behalf or for a third party that might injure the Company. While engaged by the Company, you were also obligated to devote your full time, attention and best effort to furthering the Business of the Company during normal business hours and during such other times as are reasonably necessary for the proper performance of your duties.

Rather than comply with your obligations, other employees of the Company have had to develop, improve and eliminate any bugs in any of the technology that you may have brought to the

 **Clark Hill**

Raymond Theodore Yagelski
August 26, 2021
Page 2

project along the way. As a result of their efforts, not yours, the Company Technology owned and developed by the Company is now functional, user-friendly and marketable.

In addition to your failure to deliver the workable technology as you promised, you have also been an obstructionist, obdurately refusing to turn over the property owned by Coast to Coast, Inc. You have denied source code access to the Company and your teammates. You refused to provide requested invoices, agreements, and documentation of work. In short, you have caused nothing but delays and problems.

**The Definition of Company Technology**

In order to be clear, Company Technology includes, but is not limited to the following: "ClaimMate" Technology, Camera Technology, the Reporting App, On-Demand Systems, an Inspector App, an Adjuster App, and a CRM System.

"Company Technology" also means all work product, information, ideas, knowledge, discoveries, documents, data and memoranda of any kind and in any form or medium, whether or not patentable and whether or not reduced to practice, which are conceived, developed, learned, prepared, discovered or obtained by you alone or jointly with others in the course of, or as a result of, your engagement with the Company – even during non-work hours, which relate to or result from the actual or anticipated business, work, research, investigations, products, or services of the Company, or which result, to any extent, from use of the premises or property of the Company.

In addition, "Company Technology" means all inventions, trade secret, patent, copyright, mask work and other intellectual property rights or "moral rights" throughout the world, together with all national, foreign and state registrations, applications for registration and all renewals and extensions thereof (including, without limitation, any provisionals, continuations, continuations-in-part, divisionals, reissues, substitutions and reexaminations), all goodwill associated therewith and all benefits, privileges, causes of action and remedies relating to any of the foregoing, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all such registrations, renewals and extensions; to sue for all past, present and future infringements or other violations of any rights relating thereto; and to settle and retain proceeds from any such actions).

**Intellectual Property Rights.**

This letter constitutes the legal demand that you acknowledge and agree that the Company is the sole owner of any and all property rights in all such Company Technology, including the right to use, market, sell, assign, license, or otherwise transfer or exploit the Company Technology, and the right to make such changes in them and the uses thereof as the Company may from time to time determine. You must also assign and agree to disclose in writing and to assign now or in the future, to Mr. Bader and the Company, without further consideration, your entire right, title, and interest (throughout the United States and in all foreign countries) free and clear of all liens and encumbrances, in and to all such Company Technology, when such technology is first conceived, developed, reduced to practice, or otherwise become assignable, which shall be the sole property of the Company, whether or not patentable.

 **Clark Hill**

Raymond Theodore Yagelski
August 26, 2021
Page 3

You must also acknowledge and agree that all writings and other works which may be copyrighted (including computer programs) that are related to the present or planned businesses of the Company and were prepared by you during your engagement with the Company are, to the maximum extent permitted by law, deemed to be works for hire, with the copyright automatically vesting in the Company. You have repeatedly acknowledged that technology on which you worked is Coast to Coast technology.

We are aware that you intend to participate in the GIA Symposium in Des Moines, Iowa, which is to take place from August 31, 2021 through September 1, 2021. Your cohort, Billy Musgrove, made the arrangements while working at Coast to Coast. In fact, at your request, the Company prepaid the room charge at the Embassy Suites Hotel. All ties and relationships between you and the Company were severed as of yesterday, and so acknowledged by you in a conversation with Michael Bader. It is now clear you intend to market software owned by the Company under the name ClaimMate as if it were owned by you. Unless I receive a written undertaking from you not to do so, the Company will file an action against you seeking injunctive relief and damages. The Company will also sue any person who assists in this wrongful conduct, including Billy Musgove and Raymond Yagelski, III. The Company demands the immediate return of all property owned by it in your possession, including the following:

> 2021 Nissan NV200 Van
> Chromebook computer
> Dell laptop computer (purchased August 17, 2021)
> Two credit cards
> iPhone 12 Pro Max (256 GB)

In sum, this letter is a reminder of your legal obligations to accept and agree that the Company owns all rights to the Company Technology. This letter is also a demand that you cease and desist all activities and attempts to market, convey or transfer any interest in the Company Technology and a further demand that you cease and desist any and all attempts by you, alone or with others, to injure or undermine Mr. Bader's rights and interests in the Company Technology.

Very truly yours,

CLARK HILL PLC

William G. Sullivan

WGS/ljs

cc:    Mr. Michael Bader
       Mr. Billy Musgrove (via E-mail billyraymusgrove@gmail.com)
       Mr. Raymond Yagelski, III (via E-mail ray.yagelski@gmail.com)

# EXHIBIT 6

 **Clark Hill**

William G. Sullivan
T (312) 360-5005
F (312) 517-7576
Email WSullivan@ClarkHill.com

Clark Hill
130 E. Randolph Street, Suite 3900
Chicago, Illinois 60601
T (312) 985-5900
F (312) 985-5999

August 27, 2021

**By FedEx and E-mail to nicole@Insaccel.com and megan@Insaccel.com**

Ms. Nicole Gunderson
Managing Director
Global Insurance Accelerator
321 E. Walnut Street, Suites 130 & 140
Des Moines, Iowa 50309

Ms. Megan Brandt
Program Director
Global Insurance Accelerator
321 E. Walnut Street, Suites 130 & 140
Des Moines, Iowa 50309

Re:   Raymond Yagelski, Billy Musgrove, ClaimMate

Dear Ms. Gunderson and Ms. Brandt,

Please be advised that this office represents Coast to Coast, Inc. ("Coast to Coast"), an Illinois corporation. Coast to Coast retained Raymond Yagelski in March 2021 to supervise development of software conceived by the president of Coast to Coast, Mr. Majdy ('Michael") Bader. Mr. Yagelski worked at the offices of Coast to Coast in Mokena, Illinois, on a full time basis until this week. He was provided with a Coast to Coast computer. He used an iPhone 12 ProMax provided by Coast to Coast. He was provided with a Coast to Coast van, with the company's logo on it. In fact, as of the time this letter is being written, he continues to retain them, including a Dell computer he caused Coast to Coast to purchase on August 17, 2021 at the cost of $1,931.17.

The day-to-day conceptual work on the software was done by two Coast to Coast employees, Charles Donovan and Robert Simon. They directly interfaced with the developers in China. These Coast to Coast employees were supervised by Mr. Yagelski, who in turn reported to Mr. Bader. Mr. Yagelski also interfaced with software developers in China on behalf of Coast to Coast. It has become manifest that his work with those developers has resulted in a denial of direct access to the source code. Mr. Yagelski has stated on multiple occasions that this would be rectified. His failure to do so now appears to be part of a long standing plan to deny Coast to Coast the fruits of its investment.

Mr. Yagelski separated from Coast to Coast on August 25, 2021. Until that time, he acknowledged, directly and by implication, the ownership rights of Coast to Coast to the fruits of the labor of Coast to Coast employees, software developers in China, and the work for which he was paid in full by Coast to Coast. As of the date of his separation from Coast to Coast, he has claimed, without any basis in fact, that he alone has the rights to the software developed at the expense of Coast to Coast. In fact, he has no rights to that software.

It appears Mr. Yagelski intends to market, or seek investors to continue to refine, the software app at the upcoming Global Insurance Accelerator Conference in Des Moines, Iowa

 **Clark Hill**

August 27, 2021
Page 2

on August 31 and September 1, 2021. Indeed, at his request, Coast to Coast prepaid for his hotel room at the Embassy Suites Hotel in Des Moines on behalf of Coast to Coast, which he said he would represent at the conference.

Mr. Yagelski was sent a letter from this office on behalf of Coast to Coast, directing that he cease and desist from his wrongful conduct, including participation at the Global Insurance Accelerator. A copy of that letter is forwarded herewith. If he does not immediately undertake to refrain from his unlawful conduct, Coast to Coast will enforce its rights in a court of law. This office is preparing an action to be filed in the United States District Court for the Northern District of Illinois, which will be filed in the event Mr. Yagelski does not comply with the demands of my client. Coast to Coast will seek compensatory and punitive damages against Mr. Yagelski and others. It will also seek a temporary restraining order and injunctive relief against him and all those acting in active concert with him.

Coast to Coast will enforce its rights against any person or entity that purports to claim any interest, direct or indirect, in the property it asserts as its own.

I ask that you advise me if Mr. Yagelski will be allowed to participate in the Global Insurance Accelerator, whether under his name, that of ClaimMate, or under the auspices of any other name or entity.

Yours very truly,

CLARK HILL

William G. Sullivan

WGS:ljs

 **Clark Hill**

William G Sullivan
T (312) 360-5005
F (312) 517-7576
Email-WSullivan@ClarkHill com

Clark Hill
130 E Randolph Street, Suite 3900
Chicago, Illinois 60601
T AuthorOfficeGeneralNo1
F (312) 985 5999

August 26, 2021

*via FedEx and E-mail to: claimzapp@gmail.com, ray.claims@gmail.com and largelossadjuster@gmail.com*

Raymond Theodore Yagelski
524 Fox Point Drive
Chesterton, Indiana 46304

Re: <u>TECHNOLOGY OWNERSHIP – COAST TO COAST, INC.</u>

Dear Mr. Yagelski:

On behalf of Coast to Coast, Inc., we have been asked to clarify the rights and obligations concerning certain technology developed by or for Coast to Coast, Inc. and its affiliated entities ( "Coast to Coast" or the "Company"). This technology is described below and is referred to as the "Company Technology." Specifically, we want to clarify that the Company Technology belongs to Coast to Coast.

As you are aware, Mr. Bader, on behalf of the Company, developed technology to engage in the business of linking insurance inspectors and other specialized service providers with national and regional insurance companies, adjusters, and related individuals and entities ("Business"). The Company employed you as a consultant to manage the project to develop the Company Technology on behalf of the Company in connection with the business. The Company paid you $1,500 per week to manage the project. The Company paid all outside developers that you brought into the project. You worked from Coast to Coast offices, you used its computers. You used a Coast to Coast cell phone. Accordingly, any Company Technology that was developed while you were retained by the Company, by operation of law, became the property of the Company as "works for hire." The fact that the Company has paid all sums associated with the development of this Company Technology is proof that the Company owns the Company Technology and any other inventions and patentable, trademarkable and copyrightable developments that relate to or arise out of the Business of the Company.

Moreover, while working for the Company, you owed a duty of loyalty, fidelity and allegiance to always act in the best interests of the Company and to refrain from doing anything on your own behalf or for a third party that might injure the Company. While engaged by the Company, you were also obligated to devote your full time, attention and best effort to furthering the Business of the Company during normal business hours and during such other times as are reasonably necessary for the proper performance of your duties.

Rather than comply with your obligations, other employees of the Company have had to develop, improve and eliminate any bugs in any of the technology that you may have brought to the

**Clark Hill**

Raymond Theodore Yagelski
August 26, 2021
Page 2

project along the way. As a result of their efforts, not yours, the Company Technology owned and developed by the Company is now functional, user-friendly and marketable.

In addition to your failure to deliver the workable technology as you promised, you have also been an obstructionist, obdurately refusing to turn over the property owned by Coast to Coast, Inc. You have denied source code access to the Company and your teammates. You refused to provide requested invoices, agreements, and documentation of work. In short, you have caused nothing but delays and problems.

## The Definition of Company Technology

In order to be clear, Company Technology includes, but is not limited to the following: "ClaimMate" Technology, Camera Technology, the Reporting App, On-Demand Systems, an Inspector App, an Adjuster App, and a CRM System.

"Company Technology" also means all work product, information, ideas, knowledge, discoveries, documents, data and memoranda of any kind and in any form or medium, whether or not patentable and whether or not reduced to practice, which are conceived, developed, learned, prepared, discovered or obtained by you alone or jointly with others in the course of, or as a result of, your engagement with the Company – even during non-work hours, which relate to or result from the actual or anticipated business, work, research, investigations, products, or services of the Company, or which result, to any extent, from use of the premises or property of the Company.

In addition, "Company Technology" means all inventions, trade secret, patent, copyright, mask work and other intellectual property rights or "moral rights" throughout the world, together with all national, foreign and state registrations, applications for registration and all renewals and extensions thereof (including, without limitation, any provisionals, continuations, continuations-in-part, divisionals, reissues, substitutions and reexaminations), all goodwill associated therewith and all benefits, privileges, causes of action and remedies relating to any of the foregoing, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all such registrations, renewals and extensions; to sue for all past, present and future infringements or other violations of any rights relating thereto; and to settle and retain proceeds from any such actions).

## Intellectual Property Rights.

This letter constitutes the legal demand that you acknowledge and agree that the Company is the sole owner of any and all property rights in all such Company Technology, including the right to use, market, sell, assign, license, or otherwise transfer or exploit the Company Technology, and the right to make such changes in them and the uses thereof as the Company may from time to time determine. You must also assign and agree to disclose in writing and to assign now or in the future, to Mr. Bader and the Company, without further consideration, your entire right, title, and interest (throughout the United States and in all foreign countries) free and clear of all liens and encumbrances, in and to all such Company Technology, when such technology is first conceived, developed, reduced to practice, or otherwise become assignable, which shall be the sole property of the Company, whether or not patentable.

 **Clark Hill**

Raymond Theodore Yagelski
August 26, 2021
Page 3

You must also acknowledge and agree that all writings and other works which may be copyrighted (including computer programs) that are related to the present or planned businesses of the Company and were prepared by you during your engagement with the Company are, to the maximum extent permitted by law, deemed to be works for hire, with the copyright automatically vesting in the Company. You have repeatedly acknowledged that technology on which you worked is Coast to Coast technology.

We are aware that you intend to participate in the GIA Symposium in Des Moines, Iowa, which is to take place from August 31, 2021 through September 1, 2021. Your cohort, Billy Musgrove, made the arrangements while working at Coast to Coast. In fact, at your request, the Company prepaid the room charge at the Embassy Suites Hotel. All ties and relationships between you and the Company were severed as of yesterday, and so acknowledged by you in a conversation with Michael Bader. It is now clear you intend to market software owned by the Company under the name ClaimMate as if it were owned by you. Unless I receive a written undertaking from you not to do so, the Company will file an action against you seeking injunctive relief and damages. The Company will also sue any person who assists in this wrongful conduct, including Billy Musgove and Raymond Yagelski, III. The Company demands the immediate return of all property owned by it in your possession, including the following:

> 2021 Nissan NV200 Van
> Chromebook computer
> Dell laptop computer (purchased August 17, 2021)
> Two credit cards
> iPhone 12 Pro Max (256 GB)

In sum, this letter is a reminder of your legal obligations to accept and agree that the Company owns all rights to the Company Technology. This letter is also a demand that you cease and desist all activities and attempts to market, convey or transfer any interest in the Company Technology and a further demand that you cease and desist any and all attempts by you, alone or with others, to injure or undermine Mr. Bader's rights and interests in the Company Technology.

Very truly yours,

CLARK HILL PLC

William G. Sullivan

WGS/ljs

cc:    Mr. Michael Bader
       Mr. Billy Musgrove (via E-mail billyraymusgrove@gmail.com)
       Mr. Raymond Yagelski, III (via E-mail ray.yagelski@gmail.com)

# EXHIBIT 7



August 30, 2021

William G. Sullivan
Clark Hill
Via Email: wsullivan@clarkhill.com

      RE:    Raymond Yagelski / ClaimMate / Coast to Coast, Inc.

Dear Mr. Sullivan:

      The Global Insurance Accelerator ("GIA") is in receipt of your letter dated August 27, 2021, in which you claim there is a dispute between Coast to Coast, Inc. and Raymond Yagelski regarding certain intellectual property rights and investments. This is the first notification the GIA received of this apparent dispute.

      Your letter asks if the GIA intends to allow both Coast to Coast, Inc. and Mr. Yagelski to participate in the GIA's upcoming conference. As of now, the answer is yes. There is insufficient information in your letter to allow us to investigate or evaluate your allegations, especially in light of the fact that the conference begins tomorrow.

      As you are aware, the GIA does not represent or warrant the intellectual property rights of conference attendees and/or participants. However, if you have additional information that you want the GIA to consider, please forward it to my attention.

      Very truly yours,

      *Nicole Gunderson*

      Nicole Gunderson
      Managing Director
      Global Insurance Accelerator

#3311073